UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CLAY BUCHHOLZ and LINDSAY BUCHHOLZ, *Plaintiffs* | §§§§ | |
| v. | §§ | CIVIL NO. 1-20-CV-449-RP |
| CRESTBROOK INSURANCE COMPANY d/b/a NATIONWIDE PRIVATE CLIENT *Defendant* | §§§§§ | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

TO: THE HONORABLE ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

Before the Court are Plaintiffs' Motion for Partial Summary Judgment (Dkt. 46); Plaintiffs' Motion to Exclude Proposed Expert Testimony of Jeffrey Peters (Dkt. 74); Crestbrook's Motion for Summary Judgment (Dkt. 75); Crestbrook's Motion to Strike or to Exclude Plaintiffs' 'Non-Retained Expert' Tom Haring (Dkt. 76); Crestbrook's Motion to Limit Plaintiffs' Expert Sean O'Brien (Dkt. 77); and the various response, reply, and sur-reply briefs. On November 23, 2021, the District Court referred these motions to the undersigned Magistrate Judge for disposition and Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

### I.  General Background

In 2017, Plaintiffs Clay Buchholz and Lindsay Buchholz bought a 10,000-square-foot home located at 14132 Flat Top Ranch Road in Austin, Texas (the "Residence"). Plaintiffs purchased a

home insurance policy (the "Policy")[1] from Defendant Crestbrook Insurance Company d/b/a Nationwide Private Client ("Crestbrook"). Dkt. 49 ¶ 10. Plaintiffs also purchased additional insurance coverage from Crestbrook for "Biological Deterioration or Damage." *Id.* ¶ 9. For the Policy period from January 25, 2019 through January 25, 2020, Plaintiffs paid a Policy premium of $11,477.38 and a Biological Deterioration Clean Up premium of $4,554.53. In exchange, Crestbrook agreed to provide approximately $6.4 million in general insurance coverage for Plaintiffs' Residence and $1.6 million in additional biological-deterioration coverage. *Id.* ¶ 13.

In April 2019, Plaintiffs discovered water damage in the wall of their indoor basketball court after "a basketball went through the wall." Dkt. 46-8 at 2. The water damage was caused by a leaking exterior fountain. *Id.* After discovering the water leak, Plaintiffs retained a contractor to inspect the plumbing throughout their house and perform mold testing. *Id.* This inspection revealed other water leaks in Plaintiffs' laundry room, two of their bathrooms, and a closet. *Id.* In addition, the inspection revealed mold in various areas throughout their Residence. *Id.*

Between April and July 2019, Plaintiffs submitted five claims to Crestbrook for losses for water and related mold damage in each of the rooms with a water leak ("Claims 1-5"). Dkts. 46 at 3; 46-6 at 2-3; 50-12. Plaintiffs also submitted a sixth claim for "reported mold growth"[2] and/or "Mold in HVAC system"[3] (the "Mold Claim"). Because Crestbrook determined that the water leaks were covered losses under the Policy, Crestbrook paid Claims 1-5, paying Plaintiffs $745,778 for the covered losses, including mold damage caused by the covered losses, additional living expenses, and investigation costs. Dkt. 46 at 4.

---

[1] Dkt. 46-1 at 12-40.
[2] Dkt. 46-3 at 1.
[3] Dkt. 46-6 at 3.

On July 26, 2019, however, Crestbrook sent Plaintiffs a Reservation of Rights letter as to the Mold Claim, notifying Plaintiffs that there were potential coverage questions regarding the cause of the loss, and that Crestbrook would further investigate the claim "to determine the source of the water intrusion and mold." Dkt. 46-2 at 3. In response, Plaintiffs hired MLAW Forensics, Inc., a private engineering firm, to perform a forensic investigation of the cause of the mold damage. *See* Agreement for Professional Engineering Services, Dkt. 75-3 at 73-75. Crestbrook agreed to let Plaintiff choose their own engineer and paid for Plaintiffs to use MLAW Forensics for the investigation. Dkt. 75 at 6.

MLAW engineer Dean Read, P.E., was the lead investigator assigned to Plaintiffs' case. Dkt. 46-4 at 1. Read issued his Causation Report on November 12, 2019, opining that "the elevated moisture contents and bio-organic growth (BOG) in your home . . . are the result of both discrete leaks and a 'global' issue due to interruption or restriction of the moisture vapor drive drying process cause[d] by the HVAC and other issues discussed later in this report." *Id.* at 1. Read concluded that:

1. While framing damage and localized BOG has occurred due to the discrete leaks, the localized nature of these discrete leaks cannot account for the widespread elevated moisture contents and BOG throughout the house.
2. The widespread elevated moisture contents and BOG are the result of interruptions or restrictions of the moisture vapor drive drying process.
3. The interruptions and restrictions to the drying process are the result of the following:
    a. Improperly designed or configured and non-functional HVAC systems. This is considered the primary cause for the elevated moisture contents and the BOG. If not for the issues with the HVAC systems, the elevated moisture contents and BOG would not likely have occurred.
    b. The wall paints.
    c. Stained trim boards and paneling.

3

*Id.* at 4.

Read explained that "vapor drive is a natural phenomenon where water vapor migrates through the building envelope from a warmer higher humidity state to a cooler lower humidity state based on the rules of thermodynamics." *Id.* at 3. He further explained that in Central Texas, "this vapor drive is typically into houses from hot humid air outside the house or in vented attics." *Id.* Ordinarily, the vapor will move through the walls and ceilings and then dry, causing no problems, but Read found that the Residence's HVAC systems—and to a lesser degree the wall paint, paneling, and trim—were interrupting the drying process and causing the growth of mold. *Id.*

In reaching his conclusion that the HVAC systems were the primary cause of the mold, Read relied on a report produced by Tom Green, P.E., who was retained to evaluate the HVAC systems at the Residence. *Id.* at 3. In his report, Green found that three of the six HVAC systems were "improperly sized" for the space, and three were "generally dysfunctional" but could be made operational by "reasonably easy repairs." *Id.* at 11. Green opined that the HVAC systems "short cycled," reducing the effectiveness of dehumidifying the air inside the Residence, and that "the as-found conditions of the HVAC system can easily be contributing causes to the microbial growth experienced in the residence." *Id.* at 11, 14-15. Green further opined that: "It is quite possible that the three dysfunctional systems have been in that condition for a long period (several months, if not a year or more)." *Id.* at 17.

Plaintiffs submitted the MLAW Causation Report (and attached Green Report) to Crestbrook "as evidence of what caused the mold losses" at Plaintiffs' Residence. Robinson Dep. 130:9-17, Dkt. 77-3 at 156. Crestbrook relied on the MLAW Causation Report in determining that the Mold Claim should be denied. In its Denial of Coverage Letter, Crestbrook explained that while the Policy contained Biological Deterioration or Damage coverage for mold growth, that provision

4

"would only apply if it resulted from a covered cause of loss." Dkt. 46-3 at 3. Crestbrook found that the mold growth was not caused from a covered loss under the Policy such as a water leak but, instead, was caused from workmanship and construction issues with the HVAC system, wall paint, paneling, and trim; weather conditions and dampness; and a gradual or sudden loss due to a mechanical breakdown of the HVAC system. Crestbrook contends that all of these causes fall within several exclusions under the Policy and denied the Mold Claim.

On March 13, 2020, Plaintiffs filed this coverage suit in Travis County District Court, alleging that Crestbrook wrongfully denied their Mold Claim. Dkt. 1-2. Plaintiffs allege that they have suffered a total loss in excess of two million dollars, including the cost of remediating and removing mold and repairing covered damage to the Residence. On April 28, 2020, Defendant removed this case to federal court on the basis of diversity jurisdiction under 28 U.S.C. § 1332(a). Dkt. 1. In their Third Amended Complaint, Plaintiffs allege breach of contract, bad faith, and violations of the Texas Insurance Code. They seek a declaratory judgment that the Policy covers the mold damage at issue, as well as actual and exemplary damages, attorneys' fees, and costs.

Both parties now move for summary judgment. Plaintiffs move for partial summary judgment on their breach of contract claim and ask the Court to construe the exclusions in the Policy in their favor as a matter of law. Crestbrook argues that it is entitled to summary judgment because Plaintiffs' claim is excluded under the Policy. The Court makes the following recommendations.

## II. Legal Standards

A. **Rule 56(a)**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials, and any affidavits on file show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir.

2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation also are not competent summary judgment evidence. *Id.* The party opposing summary judgment must identify specific evidence in the record and articulate the precise manner in which that evidence supports its claim. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### B. Texas Insurance Law

Because this case was removed from Texas state court on diversity jurisdiction, Texas substantive law applies. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938); *Lockwood Corp. v. Black*, 669 F.2d. 324, 327 (5th Cir. 1982). Under Texas law, insurance policies are written

contracts. As with other contracts, courts "interpret and enforce them according to settled rules of construction," and "must give the policy's words their plain meaning, without inserting additional provisions into the contract." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008). Accordingly, courts must begin their analysis with the terms of the policy, because it is "presume[d] parties intend what the words of their contract say." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) (citation omitted). The words of the policy "are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense." *Id.* (citation omitted). All parts of the policy are read together, and courts must give "effect to each word, clause, and sentence, and avoid making any provision within the policy inoperative." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010).

In insurance coverage disputes, Texas law directs courts to apply the following burden-shifting scheme: Initially, the insured has the burden of establishing coverage under the terms of the policy. *Gilbert*, 327 S.W.3d at 124. If the insured proves coverage, then to avoid liability the insurer must prove the loss is within an exclusion. *Id.* If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage. *Id.*

### III.  Analysis

Crestbrook argues that it is entitled to summary judgment because Plaintiffs' Mold Claim is not a covered loss under the Policy, and that even if it was, it falls within four exclusions. Crestbrook also argues that it is entitled to summary judgment on Plaintiffs' bad faith and Texas Insurance Code claims because there is no coverage under the Policy. Plaintiffs move for partial summary judgment on their breach of contract claim, arguing that their Mold Claim is a covered loss under the Policy and that none of the exclusions are applicable.

A.  **The Policy**

The Property Coverages provision of the Policy provides that: "We cover all risk of accidental direct physical loss to property described in Coverages A. [Dwelling], B. [Other Structures] and C. [Personal Property] below except for losses excluded under Section I-Property Exclusions." Dkt. 46-1 at 15.

The Additional Property Coverages provision of the Policy provides coverage for Biological Deterioration or Damage ("BDD"), which the Policy defines as "damage or decomposition, breakdown, and/or decay of manmade or natural material due to the presence of fungi, algae, lichens, slime, *mold*, bacteria, wet or dry rot, and any by-products of these organisms, however produced. Fungi as used above include, but are not limited to: yeasts, *mold*, mildew, rust, smuts, or fleshy fungi such as mushrooms, puffballs and coral fungi." *Id.* (emphasis added). Specifically, the BDD provision provides:

> 10. **Biological Deterioration or Damage Clean Up and Removal**. In the event that a covered cause of loss results in **Biological Deterioration or Damage** to property covered under Coverages A., B. and C., **we** will pay, up to the amount shown on the Declarations, for:
>
>     a.  the cost to clean up, remove and dispose of the **Biological Deterioration or Damage** to covered property;
>
>     b.  the cost to tear out and replace any part of the building or other covered property needed to gain access to the **Biological Deterioration or Damage**;
>
>     c.  the cost of testing which is performed in the course of clean up and removal of the **Biological Deterioration or Damage** from the **Residence Premises**; and
>
>     d.  additional living expenses **you** may incur, as outlined under Coverage D., that results from items a., b. or c. above.
>
> The coverage amount shown on the Declarations for this Additional Property Coverage is the most **we** will pay for all loss or costs payable under this Additional Coverage. Such costs are payable only if **you** report the **Biological Deterioration or**

8

>> **Damage** to **us** within one hundred eighty (180) days of having first discovered the **Biological Deterioration or Damage**.
>
>> The covered cause of loss that causes or results in **Biological Deterioration or Damage** to covered property must have occurred during the policy period.

*Id.* at 20.

> The **Property Exclusions** provision provides, in relevant part, the following:

>> **We** do not cover loss to any property resulting directly or indirectly from any of the following:
>>
>> . . .
>>
>> k. **Biological Deterioration or Damage**, except as provided by **Section I—Additional Property Coverages—Biological Deterioration or Damage** Clean Up and Removal.
>>
>> . . .
>>
>> p. A fault, weakness, defect or inadequacy in the:
>>
>>> (1) specifications, planning, zoning;
>>>
>>> (2) design, workmanship, construction, materials;
>>>
>>> (3) surveying, grading, backfilling;
>>>
>>> (4) development or maintenance;
>>
>> of any property on or off the **Residence Premises**, whether intended or not. However, any resulting loss is covered unless another exclusion applies.
>>
>> . . .
>>
>> r. Weather, Temperature or Dampness. Weather conditions include changes in temperature or air dampness. This exclusion does not apply to direct loss caused by rain, sleet, snow or hail.
>>
>> . . .
>>
>> z. Gradual or Sudden Loss due to:
>>
>>> (1) wear and tear, marring, deterioration;
>>>
>>> (2) inherent vice, latent defect, mechanical breakdown; . . . .

*Id.* at 22-24.

9

B.  **Plaintiffs' Breach of Contract Claim and Request for Declaratory Relief**

Plaintiffs allege that Crestbrook breached the Policy by failing to pay them for mold damage to their home and reimburse them for the cost of removing the mold and other remediation efforts. To plead a claim for breach of an insurance contract, Plaintiff must prove: (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result. *Vizza Wash, LP v. Nationwide Mut. Ins. Co.*, 496 F. Supp. 3d 1029, 1038 (W.D. Tex. 2020). To show a breach of the Policy, Plaintiffs must show that Crestbrook failed to pay for covered losses under the Policy.

As noted, Plaintiffs have the initial burden of establishing coverage under the terms of the policy. *Gilbert*, 327 S.W.3d at 124. If they meet that burden, the burden shifts to Crestbrook to prove the loss is within an exclusion. *Id.* If Crestbrook proves that an exclusion applies, the burden then shifts back to Plaintiffs to show that an exception to the exclusion brings the claim back within coverage. *Id.*

To meet their initial burden, Plaintiffs must show that their Mold Claim falls under the BDD provision of the Policy. As quoted above, the BDD provision applies only if the mold growth resulted from "a covered cause of loss." Thus, to show coverage, Plaintiffs must show (1) what caused the mold growth, and (2) that the cause of loss is covered loss under the Policy. They have shown neither.

In Crestbrook's First Set of Discovery Interrogatories, Crestbrook asked Plaintiffs to "[e]xplain in detail what You contend caused the alleged losses at the Residence Premises." Interrogatory No. 2, Dkt. 36-5 at 16. In response, Plaintiff stated:

> As an initial matter, Plaintiffs object that this interrogatory is premature because determination of the causes of the alleged losses requires expert opinions that are not yet available. ***Plaintiffs will supplement this answer with the opinions of their designated expert when such information becomes available and after***

10

> *disclosing their anticipated expert(s).* Subject to these objections, Plaintiffs answer that they do not bear the burden of identifying the "cause" of any loss. The insurer bears the initial burden of establishing that an exclusion applies. *Guaranty Nat'l. Ins. Co. v. Vic. Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998). Plaintiffs contend that accidental direct physical loss occurred, including damage caused by water intrusion that is covered by the policy. Plaintiffs also reserve the right to supplement this response as discovery progresses.

Dkt. 36-6 at 9 (emphasis added). Crestbrook then filed a motion to compel Plaintiffs to respond to this Interrogatory. Dkt. 35. Although the Court found that the interrogatory was proper because "the cause of the alleged mold damage to Plaintiffs' Residence is directly relevant to whether those losses fall within the terms of the Policy," it denied the motion as premature because Plaintiffs had represented to the Court that "they will supplement their response to Interrogatory No. 2 after their expert has formed an opinion as to causation." Dkt. 43 at 4-5. The Court, however, also ordered "Plaintiffs to fully supplement their answer to Interrogatory No. 2 by July 5, 2021." *Id.* at 5. Plaintiffs did not supplement their response.

After they filed this lawsuit, Plaintiffs retained Sean O'Brien "to provide expert analysis concerning the water/mold damage at the Buchholzes' home, and specifically the conclusions reached in the MLAW Report and accompanying Tom Green report." Dkt. 77-3 at 57. In his expert report, O'Brien opines that "Crestbrook lacked sufficient information to conclude that the HVAC system was a direct or indirect cause of water intrusion, and based on the evidence presented to date, our conclusion is that the HVAC system was not a direct contributor to an increased risk of mold growth." *Id.* at 63. O'Brien does not offer an opinion on what caused the mold. *See* O'Brien Dep. 40:12-15, Dkt. 77-3 at 138 ("Q. To be clear, you do not have an opinion about what did cause the mold at the Buchholzes' house, right? A. Correct."). Thus, Plaintiffs have failed to come forward with any evidence to show that the Mold Claim resulted from "a covered cause of loss."

11

Although Plaintiffs acknowledge in their Response brief that they must show that "the mold resulted from 'a covered cause of loss,'" Dkt. 82 at 9, they fail to identify the cause of the mold damage. Instead, Plaintiffs submit that the Policy "is an inclusive, 'all-risk' policy that covers 'all risk of accidental direct physical loss to the property' unless an exception applies. Crestbrook is thus obligated to pay mold-mediation costs unless another exclusion applies." Dkt. 46 at 8 (citation omitted); *see also* Dkt. 82 at 9 (contending that the Mold Claim is covered because Plaintiffs suffered mold damage and "the damage to the house qualifies as 'accidental direct physical loss'"). Plaintiffs then argue why they believe none of the Policy exclusions apply. But they skip the essential step of showing that the mold damage was caused from "a covered cause of loss." The burden does not shift to Crestbrook to show an exclusion applies until Plaintiffs first show the mold damage resulted from a covered loss. *Gilbert*, 327 S.W.3d at 124. Plaintiffs have neither identified a cause of the mold growth nor shown that a cause was a covered loss. Accordingly, Plaintiffs fail to meet their burden to show that the Mold Claim is covered under the BDD provision.

The Court need not address whether an exclusion applies because Plaintiffs fail on their first burden. "By its terms, an exclusion provision in an insurance policy would be triggered only if there were coverage under the Policy." *ILIOS Prod. Design, LLC v. Cincinnati Ins. Co.*, No. 1:20-CV-857-LY, 2021 WL 1381148, at *9 (W.D. Tex. Apr. 12, 2021), *R. & R. adopted*, 2021 WL 4487990 (W.D. Tex. May 7, 2021). As the Court has determined that there is no coverage under the Policy, the presence or absence of an exclusion provision is irrelevant.

Because Plaintiffs have not demonstrated that their insurance claim is covered under the Policy, they have not alleged a plausible breach of contract claim. *See Vizza Wash*, 496 F. Supp. 3d at 1038. Plaintiffs' Motion for Summary Judgment should be denied and Crestbrook's Motion for

Summary Judgment should be granted as to the breach of contract claim and request for declaratory relief.

### C.  Extra-Contractual Bad-Faith and Statutory Claims

Plaintiffs also assert extra-contractual claims pursuant to Texas common law and the Texas Insurance Code. "These claims fail because such claims generally cannot be maintained when the breach of contract claim they arise out of fails." *Alaniz v. Sirius Int'l Ins. Corp.*, 626 F. App'x 73, 79 (5th Cir. 2015). "As a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 602 (Tex. 2015). For an insured to recover on a bad-faith insurance claim when the insurer properly has denied coverage for the claim, the insured must demonstrate that the insurer's "conduct was extreme and produced damages unrelated to and independent of the policy claim." *Id.* Similarly, "an insured cannot recover *any* damages based on an insurer's statutory violation if the insured had no right to receive benefits under the policy and sustained no injury independent of a right to benefits." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 500 (Tex. 2018); *see also Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 920-22 (Tex. 2005) (concluding that insured's common-law conversion claim, common-law bad-faith claim, and statutory claims were all "negated" because policy did not cover underlying losses and insured did "not allege that he suffered any damages unrelated to and independent of the policy claim").

Plaintiffs have not come forward with evidence that Crestbrook's conduct was "extreme" or that they suffered damages independent of those that would have resulted from an alleged wrongful denial of his claim. *See Alaniz*, 626 F. App'x at 79 (affirming summary judgment for insurer on bad faith and Texas Insurance Code claims because there was no coverage or breach and insured put forth no evidence of "extreme conduct or of damages suffered independent of those that would have resulted from an alleged wrongful denial of his claim"). Plaintiffs allege only that Crestbrook

improperly denied their claim and failed to properly investigate the mold damage. Plaintiffs do not allege that they suffered any damages unrelated to and independent of the policy claim. *See Boyd*, 177 S.W.3d at 922 (holding that bad faith claims failed where plaintiff alleged only that insurer improperly denied claim and failed to fairly investigate facts of accident, and plaintiff did not allege that he suffered any damages unrelated to and independent of the policy claim). Accordingly, Plaintiffs' bad faith claim fails. *Alaniz*, 626 F. App'x at 79; *Boyd*, 177 S.W.3d at 922. For the same reason, Plaintiffs' DTPA claims under the Texas Insurance Code fail. *See Alaniz*, 626 F. App'x at 79; *Menchaca*, 545 S.W.3d at 500; *Boyd*, 177 S.W.3d at 922.

Accordingly, Crestbrook's Motion for Summary Judgment as to Plaintiffs' extra-contractual claims should be granted.

## IV. Order and Recommendation

Based on the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that the District Court (1) **DENY** Plaintiffs Clay Buchholz and Lindsay Buchholz's Motion for Partial Summary Judgment (Dkt. 46), and (2) **GRANT** Defendant Crestbrook Insurance Company's Motion for Summary Judgment (Dkt. 75) and enter judgment in favor of the Crestbrook.

Because the Court finds that all of Plaintiffs' claims fail, the parties' cross-motions to exclude are moot. Accordingly, Plaintiffs' Motion to Exclude Proposed Expert Testimony of Jeffrey Peters (Dkt. 74), Defendant Crestbrook's Motion to Strike or to Exclude Plaintiffs' 'Non-Retained Expert' Tom Haring (Dkt. 76), and Defendant Crestbrook's Motion to Limit Plaintiffs' Expert Sean O'Brien (Dkt. 77) are **DISMISSED** as **MOOT**.

It is **ORDERED** that the Clerk **REMOVE** this case from the undersigned's docket and **RETURN** it to the docket of the Honorable Robert Pitman.

## V. Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on February 8, 2022.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE